IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HECTOR TORRES, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil Action No. 14-6178 (JBS) |
| COMMISSIONER OF SOCIAL SECURITY, | OPINION |
| Defendant. | |

APPEARANCES:

Lauren S. Tovinsky, Esq.
JACOBS SCHWABLE & PETRUZELLI PC
10 Melrose Avenue
Cherry Hill, NJ 08003
        Attorney for Plaintiff

Paul J. Fishman
UNITED STATES ATTORNEY
        By: Melissa Kay Curry
            Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel
330 Spring Garden Street
Philadelphia, PA 19123
        Attorney for Defendant

**SIMANDLE, Chief Judge:**

## Table of Contents

I.   INTRODUCTION ............................................... 2
II.  BACKGROUND ................................................. 4
  A.  Factual and Procedural History ......................... 4
  B.  Testimony before the ALJ ............................... 8
  C.  ALJ's Decision and Affirmance by the Appeals Council ... 10
III. STANDARD OF REVIEW ........................................ 14
IV.  DISCUSSION ................................................ 16
  A.  Legal Standard for Determination of Disability ......... 16
    1.  The ALJ properly considered the vocational testimony .. 17

2.   Substantial evidence supports the ALJ's determination of Plaintiff's RFC .......................................... 21

3.   The ALJ properly evaluated and weighed the medical evidence of record. ...................................... 28

a.   The ALJ appropriately considered the GAF score reported by Dr. Shang............................................... 28

b.   The ALJ appropriately relied upon the opinions of the agency physicians......................................... 31

V.   CONCLUSION .............................................. 33

**I. INTRODUCTION**

In this action, Plaintiff Hector Torres (hereinafter, "Plaintiff"), a twenty-one year old primarily Spanish-speaking male with no prior relevant work experience, seeks review of the Commissioner of the Social Security Administration's (hereinafter, "Defendant") denial of his application for disability benefits pursuant to 42 U.S.C. § 405(g).

Plaintiff claims he is disabled from depression (and related emotional disorders), arthritis, a learning disability, and high blood pressure.  (See Pl.'s Br. at 1.)  On April 15, 2014, the Administrative Law Judge (hereinafter, the "ALJ") issued a ten-page decision denying Plaintiff Social Security benefits from the alleged onset date of disability through the date of his decision.  (See R. at 21-30.)  As relevant here, the ALJ found that Plaintiff's mental impairments, although severe, did not sufficiently impede his daily living, social functioning, and/or thought processes, and therefore allowed him to perform a full range of exertional work subject only to

certain nonexertional limitations.  (See id. at 23-25.)  For substantially that reason, the ALJ found Plaintiff "'not disabled.'"  (Id. at 29.)

In the pending appeal, Plaintiff argues that the ALJ erred on three largely related grounds.  (See generally Pl.'s Br. at 5-16.)  First, Plaintiff argues that the ALJ found Plaintiff able to work within the unskilled workforce, without appropriately accounting for certain portions of the vocational testimony and without resolving certain evidentiary inconsistencies.  (Id. at 5-7.)  Second, Plaintiff claims that the ALJ's residual functional capacity (hereinafter, "RFC") determination failed to contain a vocationally significant explanation of Plaintiff's limitations, as required by Social Security Ruling (hereinafter, "SSR") 96-8P.  (Id. at 7-12.)  Finally, Plaintiff argues that the ALJ failed to sufficiently evaluate certain medical evidence most favorable to Plaintiff.  (Id. at 12-15.)

The principal issues before the Court concern whether substantial evidence supports the ALJ's conclusion that Plaintiff retained the RFC to perform a full range of exertional work subject only to certain nonexertional limitations.

For the reasons explained below, the Court will affirm the ALJ's decision denying Plaintiff disability benefits.

## II.  BACKGROUND

### A. Factual and Procedural History

On January 23, 2012, Plaintiff, an individual with no prior history of inpatient or outpatient psychiatric care, presented himself to CompleteCare Health Network in Vineland, New Jersey, with symptoms "of a major depressive episode."[1]  (R. at 285-87.) As a result of this condition, Dr. Xiaozhou Shang admitted him to a psychiatric unit within South Jersey Healthcare on January 24, 2014, and treated him for suicidal ideation, depression, and auditory hallucinations.  (R. at 291-95.)  On January 31, 2012, Dr. Shang discharged Plaintiff from the hospital, after he responded favorably to his new medication, presented an improved mood and affect, and an ability to engage in social activities. (See id.)

Following this episode, however, Plaintiff filed an application for Social Security disability benefits, claiming an inability to function and/or work as of June 30, 2011.  (R. at 77-87.)  In connection with the Social Security Administration's (hereinafter, the "SSA") review of Plaintiff's initial application, the New Jersey Division of Disability Services

---

[1] The records from Complete Care specifically indicate that Plaintiff reported anxiety, depressed mood, fatigue/loss of energy, feelings of guilt or worthlessness, poor concentration, restlessness or sluggishness, sleep disturbance, thoughts of suicide. (See R. at 285.)

conducted a telephone interview of Plaintiff on February 10, 2012.  (See R. at 183-85.)  During the interview, the examiner identified Plaintiff as coherent, concentrated, and able to understand the interview, but noted that he had "a lot of trouble understanding even basic questions," rendering it "difficult to get information from [him] throughout the interview."  (Id. at 184.)

As a result, the claims adjudicator requested that Plaintiff complete a functional audit, describing, in greater written detail, the manner in which his claimed impairments limit his daily activities.  (See R. at 209-16.)  In connection with this functional audit, Plaintiff identified certain depressive behavior (crying, nervousness, and "bad" thoughts at night) that impacts his mood and concentration, but otherwise professed an ability to cook, shop, travel, understand written instructions, get along with others, and perform an array of physical activities.[2]  (Id.)

After completing these assessments, Plaintiff sat for a mental status/psychological examination with Dr. Lewis A. Lazarus on April 25, 2012, followed by a physical evaluation

---

[2] Plaintiff's mother also completed a third-party audit of Plaintiff's functional capacity, in which she appears to echo Plaintiff's statements.  (See R. at 201-08.)  Nevertheless, because Plaintiff's mother completed the audit in Spanish, and no party has provided a transcribed copy, the Court cannot address it in any degree of detail.

with Dr. Francky Merlin on June 6, 2012.  (See R. at 300-09.)

During his psychological examination, Plaintiff acknowledged

that he suffers from periodic "crying spells, diminished self-

esteem, and a markedly diminished interest," but presented a

"cooperative demeanor," adequate social skills, and

concentration.  (Id. at 300-01.)  Dr. Lazarus, however, found

his intellectual functional capacity "limited" with a "below

average general fund of knowledge," and assessed him a GAF score

of 51,[3] on account of his generally "guarded" nature.[4]  (Id. at

301-02.)  During his physical evaluation, by contrast, Dr.

Merlin found Plaintiff able to sit, stand, walk, crouch, carry,

hear, and speak, and otherwise determined Plaintiff's physical

condition to be within normal ranges in all respects.  (See id.

at 304-09.)  Indeed, Dr. Merlin observed Plaintiff as having

appropriate affect and behavior, normal gait and station, full

motor strength, and normal reflexes.  (See R. at 305.)

---

[3] The Global Assessment of Functioning, or GAF Scale, is a
numeric scale that mental health physicians and doctors use to
rate the occupational, psychological, and social functioning of
adults.  See Rivera v. Astrue, 9 F. Supp. 3d 495, 496 n.1 (E.D.
Pa. 2014) (citation omitted).  "The GAF scale, designed by the
American Psychiatric Association, ranges from 1 to 100, with a
score of 1 being the lowest and 100 being the highest."  Id.
(citation omitted).
[4] In addition, Dr. Lazarus observed that Plaintiff had adequate
manner of relating and social skills, coherent and goal-directed
thought processes, and presented no evidence of hallucinations,
delusions, or paranoia.  (See R. at 26, 301.)

Based in large part upon Dr. Lazarus' assessment (along with the remaining medical evidence), the SSA medical examiner, Dr. Amy Abrams, found that Plaintiff's impairment imposes a mild limitation on his daily activities, a moderate limitation on his social functioning and concentration, and that his intellectual capacity largely limited him to unskilled work. (See id. at 77-87.) Dr. Abrams, however, concluded that these non-exertional limitations did not prevent him from obtaining employment within the national economy, and the SSA therefore denied his initial application on June 18, 2012. (R. at 99.)

Plaintiff requested reconsideration of this initial determination on July 26, 2012. (See, e.g., R. at 113-15.) In so requesting, however, Plaintiff did not report any change in his physical and/or mental limitations, nor provide any additional medical evidence. (See R. at 90-100.) Rather, Plaintiff merely relied upon the same information submitted in connection with his initial application. (Id.) Given the absence of any new allegations, in addition to the functional abilities reflected by Plaintiff non-exertional limitations, the reviewing SSA medical examiner, Dr. Pamela Foley, found the initial determination supported by the medical and consultative evidence, and denied Plaintiff's request for reconsideration on November 21, 2012. (See R. at 98-99.)

7

On December 3, 2012, Plaintiff requested, with counsel, a de novo hearing before an ALJ, on the basis that his limitations precluded him from working. (See R. at 116-18.)   Again, however, Plaintiff stated that he had "no additional evidence to submit." (Id.)

**B. Testimony before the ALJ**

On December 13, 2013, the ALJ, Kenneth Bossong, convened a hearing, at which time Plaintiff appeared, with counsel and an interpreter, and the ALJ received testimony from Plaintiff as well as a vocational expert, Mary Morocco. (See generally R. at 35-76.)

At the start of the hearing, Plaintiff's counsel argued that Plaintiff's action amounts to "primarily a psychiatric case," on account of the fact that Plaintiff "suffers from medically-determinable impairments, all of a non-exertional variety." (Id. at 40 (emphasis added).)   Following this opening argument, Plaintiff testified that he resides with his mother in Vineland, New Jersey, and that he completed schooling up through 11th grade (and has not attempted to attain a GED) (Id. at 44-46, 55.)   Nevertheless, Plaintiff professed an ability to read and write in both English and Spanish, and specifically stated that he enjoys reading the Bible. (R. at 27, 46, 55.) Plaintiff, however, claimed no fluency in English, and insisted

8

that he cannot add, subtract, make change, and/or perform chores around the house.  (R. at 46-47, 53.)

Beyond this, Plaintiff stated that his "agoraphobia" and the "voices" in his head caused him to spend the majority of his time alone in his room.  (R. at 47-53.)  Nevertheless, Plaintiff acknowledged that his mental condition had vastly improved since his hospitalization in January 2012, due to his medication and "continued treatment."  (R. at 48-52.)  Even more, Plaintiff testified that he enjoys eating out at restaurants, exercising in the park, shopping for clothes with his mother, and even spending one night out per month with his boyfriend.  (See R. at 55-62.)  His boyfriend, whom he described as a partner, also visits him frequently at home.  (See R. at 56.)

The vocational expert, Mary Morocco, followed Plaintiff's testimony.[5]  (See generally R. at 65-76.)  As relevant here, the ALJ asked Ms. Morocco whether any jobs existed that required limited "facility with English," only "simple instructions," "no more than occasional interaction with the public and coworkers," and a work setting that changed "infrequent[ly]."[6]  Ms. Morocco

---

[5] Although the record is silent on Ms. Morocco's precise qualifications, Plaintiff's counsel stipulated to the adequacy of her qualifications as a vocational expert.  (See R. at 64.)
[6] Given Plaintiff's counsel representation concerning Plaintiff's lack of exertional limitations, the ALJ did not, however, include any exertional limitations in the hypothetical. (See R. at 65-66.)

testified, in turn, that the positions of agricultural packer, buckle wire inserter, and produce weigher all fit within the hypothetical (among other positions).[7]  (R. at 65-67.)  In response to questioning from Plaintiff's counsel, however, Ms. Morocco acknowledged that an individual with an inability to maintain something more than occasional "contact with supervisors and coworkers" during the probationary employment period may struggle to sustain lasting employment.  (See generally R. at 73-74.)

Following the hearing and at the request of Plaintiff's counsel, the ALJ left the evidentiary record open for an additional four (4) months for the submission of further documents on Plaintiff's psychiatric treatment.  Plaintiff, however, submitted no additional materials (see R. at 26, 40, 42-43), and failed to appear for a second psychological examination with Dr. Lazarus in February 2014.  (See R. at 27, 312, 318-20.)  As a result, the ALJ deemed the record closed.

**C. ALJ's Decision and Affirmance by the Appeals Council**

In a written decision dated April 15, 2014, the ALJ discussed, at length, Plaintiff's statements and testimony concerning his functional abilities and limitations, in addition to the various consultative examiners' findings and

---

[7] Plaintiff's counsel stipulated on the record hearing that "other" positions fit within the hypothetical.  (R. at 67.)

10

observations, and the testimony adduced during the hearing.  (R. at 23-30.)

The ALJ concluded that Plaintiff had not engaged in substantial gainful activity (or any relevant work) since January 17, 2012, the protective filing date of Plaintiff's initial application for Social Security benefits.  (See R. at 23.)  The ALJ further determined that Plaintiff suffered from the impairments of an anxiety disorder, depression, and a learning disorder (see R. at 23), but found that these impairments did not meet or equal in severity any impairment found in the Listing of Impairments, including Listing section 12.02 ("Organic Mental Disorders"), 12.04 ("Affective Disorders"), and 12.06 ("Anxiety-Related Disorders").  (R. at 23-24.)  In so finding, the ALJ considered whether Plaintiff's exclusively mental impairments "result[ed] in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of [an] extended duration."[8]  (Id.)  However, because Plaintiff's impairments

---

[8] The ALJ explained that a "marked limitation means more than moderate but less than extreme," and that repeated episodes of decompensation means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  (R. at 23.)

caused only "mild restriction" in daily activities, "moderate difficulties" in social functioning, concentration, persistence, and pace, and only one episode of decompensation, the ALJ found that Plaintiff's impairments did not satisfy these requirements. (R. at 24.)

In addressing Plaintiff's residual functional capacity, the ALJ evaluated, among other factors, Plaintiff's testimony and other statements regarding his ability to engage in daily activities, his assertions concerning restrictions and/or limitations on his abilities, and the medical opinions rendered by the various consultative examiners (including Dr. Shang and Dr. Lazarus). (R. at 25-28.)  The ALJ, however, found that the record evidence indicated that Plaintiff suffered from impairments of a lesser "intensity, persistence, and limiting effect" than he professed. (Id. at 26.)  In that respect, the ALJ noted that Plaintiff showed a good response to treatment and medication and an improved mood following his hospitalization, testified to a range of skills (even if limited), and presented a range of functional abilities during his examination by Dr. Lazarus.  (Id. at 26-27.)  In addition, the ALJ noted that the objective medical evidence consistently reflected only mild and moderate non-exertional limitations, and no severe physical impairments.  (See R. at 28.)

12

Even more critically, the ALJ recounted several inconsistencies that adversely affected Plaintiff's credibility. (See R. at 27.)  Specifically, the ALJ found Plaintiff's testimony "regarding the severity of his symptoms" diminished "by his admission" that his symptoms and mood improved with his medications.  (Id.)  The ALJ likewise found Plaintiff's testimony concerning his intellectual limitations and agoraphobia inconsistent with the testimony "that he enjoys eating out at restaurants weekly, exercises in the park, [] shops for clothes," and possesses a range of functional skills (reading, writing, dressing, bathing, limited cooking, and similar).  (Id.)  Finally, the ALJ described Plaintiff's consistent failures to appear (without explanation) for examinations, as well as the absence of any evidence that Plaintiff sought "ongoing treatment for his [allegedly severe] mental health symptoms."  (Id. at 27.)

After surveying all of this evidence, the ALJ determined that Plaintiff possessed the residual functional capacity to perform work at all exertional levels, but that his nonexertional limitations required that the work activities be limited to simple, repetitive tasks that involve simple instructions with occasional social contact and infrequent or gradual changes in work setting.  (See R. at 28.)  Based upon this RFC, the Medical-Vocational Guidelines, SSR 85-15, and the

consistency between the vocational expert's testimony and the information contained within the Dictionary of Occupational Titles, the ALJ then determined that Plaintiff could perform work existing in significant numbers within the national economy, and found Plaintiff "not disabled."  (R. at 29.)

Following the decision, Plaintiff filed a formal request for review on May 12, 2014 (see R. at 14), and submitted "2 pages" of "contentions" concerning Plaintiff's alleged entitlement to Social Security benefits (but no additional evidence). (R. at 4; see also R. at 232-33.)  The Appeals Council, however, found "no reason" to review the ALJ's decision and, accordingly, denied Plaintiff's request for review on September 10, 2014, thereby rendering the ALJ's decision the final administration decision in this action.  (R. at 1-3.) Plaintiff timely filed this action, which Defendant opposes. The Court has jurisdiction to review the Defendant's final decision pursuant to 42 U.S.C. § 405(g).

## III. STANDARD OF REVIEW

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008).  The requirement of substantial evidence, however, constitutes a deferential standard of review, see Jones v. Barnhart, 364 F.3d

501, 503 (3d Cir. 2004), and does not require "a large or [even] considerable amount of evidence." Pierce v. Underwood, 487 U.S. 552, 564 (1988).  Rather, substantial evidence requires "more than a mere scintilla[,]" Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), but generally less than a preponderance.  See Jones, 364 F.3d at 503.

In order to facilitate the Court's review, the ALJ must set out a specific factual basis for each finding.  Baerga v. Richardson, 500 F.2d 309 (3d Cir. 1974), cert. denied, 420 U.S. 931 (1975).  Additionally, the ALJ "must adequately explain in the record [the] reasons for rejecting or discrediting competent evidence," Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)), and must review all pertinent medical and nonmedical evidence "and explain his conciliations and rejections."  Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000).  However, the ALJ need not discuss "every tidbit of evidence included in the record."  Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir. 2004).  Rather, the ALJ must set forth sufficient findings to satisfy the reviewing court that the ALJ arrived at a decision through application of the proper legal standards, and upon a complete review of the relevant factual record.  See Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983).

## IV.  DISCUSSION

### A. Legal Standard for Determination of Disability

The SSA reviews claims of disability in accordance with the sequential five-step process set forth in 20 C.F.R. § 404.1520. In step one, the SSA determines whether the claimant currently engages in "substantial gainful activity."  20 C.F.R. § 1520(b). In step two, the claimant must demonstrate that the claimant suffers from a "severe impairment."  20 C.F.R. § 1520(c). Impairments lacking sufficient severity render the claimant ineligible for disability benefits.  See Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  Step three requires the Commissioner to compare medical evidence of the claimant's impairment to the list of impairments presumptively severe enough to preclude any gainful activity.  20 C.F.R. § 1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Plummer, 186 F.3d at 428. Step four requires the ALJ to consider whether the claimant retains the ability to perform past relevant work.  20 C.F.R. § 1520(e).  If the claimant's impairments render the claimant unable to return to the claimant's prior occupation, the ALJ will consider in step five whether claimant possesses the capability to perform other work existing in significant numbers in the national economy, given

16

the claimant's RFC, age, education, and work experience.  20
C.F.R. § 1520(g); 20 C.F.R. 404.1560(c).

Here, Plaintiff presents three challenges to the ALJ's
finding, and the Court shall address each in turn.

### 1. The ALJ properly considered the vocational testimony

In his first challenge to the ALJ's decision, Plaintiff
argues that the ALJ ignored certain vocational testimony that
would have resulted in a finding of disability, and therefore
erred in his step 5 analysis.  (See Pl.'s Br. at 5-8.)
Defendant, by contrast, takes the position that the ALJ
appropriately relied upon the vocational testimony (among other
evidence) in finding Plaintiff capable of performing work
existing in significant numbers in the national economy.  (See
Def.'s Opp'n at 13-14.)  For the reasons that follow, the Court
finds no reversible error in the ALJ's consideration of the
vocational testimony.

In order to determine at step 5 whether jobs exists in the
national economy for a particular plaintiff, the Court of
Appeals generally requires that an ALJ support its determination
by citing to relevant rules, relying upon vocational testimony,
and/or by taking judicial notice of certain vocational
resources.  See Sykes v. Apfel, 228 F.3d 259, 273 (3d Cir.
2000); Hall v. Comm'r of Soc. Sec., 218 F. App'x. 212, 217 (3d
Cir. 2007).

When a claimant exhibits "only exertional (i.e. strength) impairments," the ALJ may properly rely in step five solely upon the Medical-Vocational framework, or grids. Nieves v. Comm'r of Soc. Sec., No. 12-5590, 2013 WL 3811645, at *4 (D.N.J. July 22, 2013) (citing Sykes, 228 F.3d at 269). Where, however, the claimant exhibits only nonexertional limitations, as here, the ALJ cannot simply rely on the medical-vocational guidelines to direct a finding of not disabled at step five. See Hall, 218 F. App'x at 215. Rather, the ALJ must take the testimony of a vocational expert or rely upon other similar evidence, such as a learned treatise. See Sykes, 228 F.3d at 273. Reliance upon a vocational expert, in turn, often centers upon one or more hypotheticals posed by the ALJ to the vocational expert. See Rutherford v. Barnhart, 399 F.3d 546, 553-54 (3d Cir. 2005). In framing these hypotheticals, the ALJ "must accurately convey" all of the plaintiff's "credibly established limitations." Id. (emphasis in original); see also Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984) (same).

Here, in finding Plaintiff limited to work that involves no more than occasional contact with others (co-workers, supervisors, and the public), the ALJ relied upon the testimony of the vocational expert, as well as the consistent vocational information contained within the Dictionary of Occupational Titles. (See R. at 29.) Plaintiff argues, however, that the

ALJ's determination ignored the vocational expert's additional testimony that the probationary period of most unskilled work requires more than occasional contact, and that an inability to sustain this limited "more than occasional" contact would render an individual unable "to sustain employment."[9]  (Pl.'s Br. at 7 (citing R. at 74).)  The Court, however, finds Plaintiff's challenge without merit.

In that regard, the Court notes, at the outset, that Plaintiff cites no support for his position that a limitation to occasional interaction with supervisors (during a probationary period or otherwise) necessarily directs a finding of disability.  (See Pl.'s Br. at 7-8.)  Indeed, courts routinely find that an individual can perform unskilled work in the national economy, despite a limitation to only occasional interaction with coworkers, supervisors, and the public.  See, e.g., Butler v. Colvin, No. 13-7488, 2015 WL 570167 (D.N.J. Feb. 11, 2015) (finding that substantial evidence supported the Commissioner's decision where Plaintiff was limited to only occasional interaction with co-workers and supervisors); Anderson v. Colvin, No. 14-94, 2015 WL 539909 (W.D. Pa. Feb. 10, 2015) (same); McCarl v. Colvin, No. 13-1803, 2015 WL 540067

---

[9] Counsel for Plaintiff did not object to the ALJ's hypothetical at the time of the hearing, nor does Plaintiff challenge the accuracy of the ALJ's hypothetical in connection with the pending appeal.

(W.D. Pa. Feb. 10, 2015) (same); Torres v. Comm'r of Soc. Sec., No. 13-5439, 2015 WL 418171 (D.N.J. Jan. 30, 2015) (affirming where the ALJ's RFC assessment, which included only occasional interaction with supervisors, coworkers, and the public, was consistent with the claimant's functional limitations); Williams v. Colvin, No. 13-5566, 2015 WL 221078 (E.D. Pa. Jan. 15, 2015) (same).

Even more, Plaintiff overstates the overall importance of the vocational expert's testimony in connection with the ALJ's step five determination.  Indeed, the ALJ's conclusion that Plaintiff could transition to work that exists in significant numbers in the national economy rested upon the testimony of the vocational expert, the information contained in the Dictionary of Occupational Titles (hereinafter, the "DOT"), and Plaintiff's own testimony.  (See R. at 29.)  Under the Third Circuit's decision in Sykes and the SSA's acquiescence rulings, however, the ALJ could have founded his determination solely upon the DOT, without even considering the testimony of the vocational expert (or that of Plaintiff).  See Buffington v. Comm'r of Soc. Sec., No. 12-100, 2013 WL 796311, at *10 (D.N.J. Mar. 4, 2013) (explaining that, under Sykes, an ALJ may rely upon the DOT as vocational evidence); Edley v. Apfel, No. 99-422, 2001 WL 641749, at *7 & n.8 (D. Del. Apr. 10, 2001) (citations omitted) (describing the DOT as a learned treatise, and noting an ALJ's

20

ability to rely upon the DOT in lieu of live vocational testimony).  Against that backdrop, the Court cannot find any error in the manner in which the ALJ evaluated the vocational testimony.[10]

For all of these reasons, the Court rejects Plaintiff first argument.

### 2. Substantial evidence supports the ALJ's determination of Plaintiff's RFC

In his second challenge to the ALJ's decision, Plaintiff contends that the ALJ erred in his determination of Plaintiff's RFC, because he (1) allegedly failed to define the Plaintiff's RFC limitations using "vocationally significant language" and because (2) he purportedly failed to consider the cumulative impact of Plaintiff's severe and non-severe medical impairments, as required by SSR 96-8P.  (Pl.'s Br. at 10-11.)  Defendant, however, argues that the ALJ's RFC assessment rightly accounted for the functional limitations supported by the record, and otherwise conformed with the required analysis.  (See Def.'s Opp'n at 6-11.)  For the reasons that follow, the Court finds

_____

[10] Nor, for the same reasons, can the Court find that the testimony of the vocational expert contained any inconsistency that required explanation by the ALJ in order "to make clear for subsequent reviewers" how the ALJ reached "the ultimate finding denying disability benefits."  (Pl.'s Br. at 7.)  To the contrary, the ALJ's decision, which is clear and comprehensive in its factual findings and application of law, makes plain the bases upon which he denied Plaintiff's application for disability benefits.  (See generally R. at 21-30.)

that substantial evidence supports the ALJ's ultimate finding regarding Plaintiff's RFC.

The RFC constitutes "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996); see also 20 C.F.R. § 416.945(a).  In that way, the RFC calls for "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities," despite any exertional and/or nonexertional limitations.  Id. at *3-*6.  This analysis, in turn, ordinarily involves an assessment of the individual's ability to perform the physical demands of work (such as sitting, standing, walking, lifting, etc.) and the mental demands of work (including understanding, remembering, and carrying out instructions), in light of the "total limiting effects" of the documented severe and nonsevere impairments.  20 C.F.R. § 404.1545(b)-(d).  Following this initial analysis, the RFC may then "be expressed in terms of the exertional levels of work..." SSR 96-8p, 1996 WL 374184, at *1.

Here, the ALJ found that Plaintiff "has the residual functional capacity to perform a full range of work at all exertional levels" subject to the following nonexertional limitations: Plaintiff "is limited to understanding to

22

understanding, remembering, and carrying out simple instructions where coworker and public contact is occasional, where good facility is not required, and in a work setting where changes are infrequent and gradually introduced." (R. at 25 (emphasis omitted).) Plaintiff's challenge to the ALJ's RFC assessment hinges, in essence, upon his position that the phrases "facility with English language" and "infrequently and gradually introduced" do not amount to the "required" function-by-function assessment of Plaintiff's abilities, and that the ALJ's determination otherwise fails to provide a meaningful comparison between the demands of work-related activities and Plaintiff's actual abilities. (Pl.'s Br. at 10-11.) The Court, however, finds Plaintiff's position without merit.

Critically, "[a]lthough a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce ... a detailed statement in writing." Bencivengo v. Comm'r of Soc. Sec., 251 F.3d 153 (Table), 00-1995, slip op. at 4 (3d. Cir. Dec. 19, 2000). Indeed, in Bencivengo, the Court of Appeals for the Third Circuit specifically rejected the notion that SSR 96-8p requires an ALJ "'to make specific, written findings on dozens of individual work function categories.'" Hernandez-Flores v. Comm'r of Soc. Sec., No. 13-4738, 2015 WL 4064669, at *6 (D.N.J. July 1, 2015) (citing Bencivengo, slip op. at 4). Rather, the ALJ must "'articulate how the evidence in the record

23

supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record.'" Id. (citing Bencivengo, slip op. at 4-5); see also Long v. Astrue, No. 10-2828, 2011 WL 721518, at *2 (E.D. Pa. Feb. 23, 2011) (relying upon Bencivengo for the same premise).  In other words, in order to discharge the ALJ's evaluative obligation, the ALJ must consider all the relevant evidence, and must render an RFC finding "with 'a clear and satisfactory explication'" of the substantial bases upon which it rests.[11]  Santiago v. Barnhart, 367 F. Supp. 2d 728, 733 (E.D. Pa. 2005) (citing Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001) (citation omitted)).

The ALJ's RFC determination in this instance plainly satisfies this standard.[12]  Indeed, in assessing Plaintiff's RFC,

---

[11] For that reason, courts routinely affirm ALJ decisions without a written function-by-function analysis, where the ALJ's RFC determination rests upon substantial evidence.  See, e.g., See Garrett v. Comm'r of Soc. Sec., 274 F. App'x 159 (3d Cir. 2008) (finding no failure in failing to perform a function-by-function analysis, where the ultimate RFC determination rested upon substantial evidence); Salles v. Comm'r of Soc. Sec., 229 F. App'x 140 (3d Cir. 2007); White v. Astrue, No. 10-1233, 2012 WL 1555399, at *9-*10 (E.D. Pa. Jan. 24, 2012), adopted by, 2012 WL 1555435 (E.D. Pa. May 3, 2012); Long, 2011 WL 721518, at *2; Adams v. Barnhart, No. 02-2365, 2004 WL 632704, at *2 (E.D. Pa. Jan. 29, 2004); Gaul v. Barnhart, No. 07-351, 2008 WL 4082265, at *6-7 (E.D. Pa. Aug. 25, 2008).

[12] The Court rejects, at the outset, Plaintiff's position that the ALJ's RFC decision must be reversed, because his analysis failed to mention insomnia or lumbago (or, lower back pain). (See Pl.'s Br. at 11 (citing R. at 285).)  Critically, in evaluating Plaintiff's RFC, the ALJ needed only to consider the

24

the ALJ thoroughly discussed Plaintiff's <u>limited</u> medical
history, his self-reported limitations and abilities, his
hearing testimony, the medical opinions of the consultative
examiners and medical consultants, as well as the other record
evidence.  The ALJ credited, in particular, Plaintiff's
statements regarding his anxiety and depression and the records
relative to his January 2012 hospitalization.  (<u>See</u> R. at 25-
26.)  Nevertheless, the ALJ noted that (1) Plaintiff "showed [a]
good response to treatment with psychotropic medical and
psychotherapy," (2) that at the time of discharge he had an
"improved mood, brighter affect," and no delusions or suicidal
ideation, and (3) that Plaintiff provided "absolutely no other
mental health treatment" records (nor any evidence of ongoing

---

limitations with evidentiary support in the record.  <u>See</u> <u>Salles
v. Comm'r of Soc. Sec.</u>, 229 F. App'x 140, 148 (3d Cir. 2007)
(citations omitted) (finding certain limitations properly
excluded in the ALJ's RFC determination, based upon the lack of
evidentiary support).  The record in this instance, however, is
devoid of any evidence (medical or otherwise) that Plaintiff's
insomnia and lumbago exacerbated his impairments, nor did
Plaintiff rely upon these conditions to support his claimed
disability.  Indeed, the medical evidence relevant to the
determination of Plaintiff's eligibility for benefits
consistently documented no abnormal physical findings (back-
related or otherwise) nor insomnia.  (<u>See, e.g.</u>, R. at 300-11.)
Even more, Plaintiff's position on the severity of his lumbago
proves plainly inconsistent with his counsel's representation to
the ALJ that this action constitutes "primarily a psychiatric
case," because Plaintiff suffers from limitations "all of a non-
exertional variety."  (R. at 40.)

mental health treatment).[13]  (R. at 26-27.)  The ALJ further
explained why certain aspects of Plaintiff's own testimony cast
doubt upon the severity of his mental impairment,[14] particularly
to the extent he admitted to engaging in (and even enjoying)
activities that were inconsistent with his claimed impairment.[15]
(Id. at 27.)  The ALJ then noted the expert opinion evidence
that consistently reflected that Plaintiff possessed "a
generally normal range of functional abilities" as evidenced by
his reported daily activities and the results of his various
examinations, subject only to certain nonexertional limitations
related to his ability to understand simple instructions and to

---

[13] The ALJ provided Plaintiff with ample opportunity to produce
all relevant medical records.  The ALJ kept the hearing record
open "for more than 4 months" specifically to allow Plaintiff's
counsel to provide recent mental health treatment records.  (R.
at 26.)  Plaintiff, however, provided no such records.
[14] Plaintiff argues that the ALJ "misstated" Plaintiff's
testimony "that he no longer hears voices when he takes his
medication," and claims that this alleged error demonstrates the
impropriety of the ALJ's RFC finding.  (Pl.'s Br. at 11 (citing
R. at 27).)  Nevertheless, the ALJ's statement in this regard
plainly comports with Plaintiff's own testimony (see R. at 51-
52), and even if the testimony could be interpreted differently,
Plaintiff stated that these voices occur only "[a]t night."
(Id. at 51.)  As a result, these alleged voices have no
identified impact on Plaintiff's ability to perform work on a
regular and continuing basis during the workday.
[15] Plaintiff, for example, testified that his agoraphobia
precluded him from working and caused him to spend the majority
of the time in his room.  (See R. at 47, 53.)  Plaintiff,
however, then acknowledged that he eats out at restaurants
weekly, exercises in the park, shops for clothes, and spends
time when he "feel[s] like it" with his boyfriend.  (R. at 55-
56, 61-63.)

26

adapt to work environments (i.e., the conditions the ALJ accounted for in assessing Plaintiff's RFC).  (Id. at 27-28.)

Against this backdrop, the ALJ plainly reviewed all of the relevant evidence, and provided a clear explanation of the bases for his determination that Plaintiff retained the RFC to perform a limited range of unskilled work.  See Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004); Fargnoli, 247 F.3d at 41 (3d Cir. 2001); Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000).  Even more, substantial evidence supports the ALJ's determination that the "objective medical evidence" did not support Plaintiff's subjective complaints, particularly given the inconsistencies in Plaintiff's own testimony and his failure to produce substantiating documentation.  See Lane v. Comm'r of Soc. Sec., 100 F. App'x 90, 95-96 (3d Cir. 2004) (citation omitted) (finding that without medical evidence on behalf of a claimant describing his or her work-related functional limitations, the claimant "cannot establish disability under the Social Security Act").

For all of these reasons, the Court finds substantial evidence supports the Commissioner's findings regarding Plaintiff's residual functional capacity.

### 3. The ALJ properly evaluated and weighed the medical evidence of record.

In his final challenge to the ALJ's decision, Plaintiff argues that the ALJ failed to adequately treat the GAF score assigned to Plaintiff by Dr. Shang at the time of discharge from his 7-day hospitalization, and afforded undue weight to the opinions of the state agency examiners and physicians.  (See Pl.'s Br. at 12-15.)  The Commissioner, however, argues that the ALJ "fully discussed the evidence or record," and appropriately relied upon all credibly-established evidence.  (Def.'s Br. at 11-13.)  For the reasons that follow, the Court finds no error in the ALJ's evaluation of the record evidence.

### a. The ALJ appropriately considered the GAF score reported by Dr. Shang

Plaintiff argues that Dr. Shang's assignment of a GAF score of 50 to Plaintiff supports, by itself, a finding of disability, because it reflects serious psychiatric symptoms which generally preclude vocational functioning at any level of exertion on a regular and continuing basis.  (Pl.'s Br. at 12.)

Critically, the GAF score constitutes little more than a "'numerical summary of a clinician's judgment of [an] individual's overall level of functioning," and has no "'direct correlation to the severity requirements'" under the Social Security Administration Rules.  Rivera, 9 F. Supp. 3d at 504 (citations omitted); see also Gilroy v. Astrue, 351 F. App'x

714, 715 (3d Cir. 2009). Nevertheless, because the GAF score remains acceptable and reliable medical evidence, the ALJ must consider and weigh the importance of the GAF score, and must specify the reasons, if any, for discounting it. See Rivera, 9 F. Supp. 3d at 505 (citations omitted); see also Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 435 (3d Cir. 1999) (citation omitted) ("[w]here competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence....").

Here, the ALJ readily acknowledged Dr. Shang's assignment of a GAF score of 50, and stated that such a GAF score "reflects serious" mental symptoms.[16] (R. at 26 & n.1) Nevertheless, the ALJ noted that the record contained "absolutely no other [consistent] mental health treatment notes," and that despite ample opportunity, Plaintiff failed to provide medical evidence concerning the manner in which, if at all, his mental impairment

---

[16] Because the record in this instance contains only two GAF scores (one by Dr. Shang and the other by Dr. Lazarus), this action differs from the more typical situation in which the ALJ "cherry-pick[s]" high GAF scores and ignores a plethora of lower GAF scores that may support a disability. Colon v. Barnhart, 424 F. Supp. 2d 805, 813-14 (E.D. Pa. 2006); see also West v. Astrue, No. 09-2650, 2010 WL 1659712, at *4-6 (E.D. Pa. Apr. 26, 2010) (remanding for failure to consider an array of GAF scores). In those paradigmatic scenarios, the GAF score rises to greater preeminence in the overall disability determination, because it (together with the accompanying explanation) often constitutes the core of the plaintiff's medical evidence. See, e.g., Rivera, 9 F. Supp. 3d at 505-06. Here, by contrast, the GAF constitutes only an isolated portion of the record evidence, and as noted by the ALJ, lacks any consistent support in the remainder of the record. (See R. at 26.)

affects his functions.[17]  (Id.)  Plaintiff then failed to appear
for a second, post-hearing psychological evaluation with Dr.
Lazarus.  (See R at 27.)  Against this backdrop, and because of
inconsistencies in Plaintiff's own testimony regarding the
severity of his mental symptoms, the ALJ discounted that
particular GAF score, and instead credited the ample evidence
reflecting (1) that Plaintiff's overall mental status improved
through medication, and (2) that Plaintiff otherwise possessed
"a generally normal range of functional abilities."  (R. at 26-
28.)  As particularly relevant here, this evidence included the
fact that Dr. Lazarus assigned Plaintiff a GAF score of 51,
thereby placing him in the moderate rather than severe mental
symptomatology category (see R. at 26, 301),[18] and Plaintiff's
testimony regarding his independence and his admissions

---

[17] This deficiency alone proves fatal to Plaintiff's position,
because although "[c]linicians use a GAF scale to identify an
individual's overall level of functioning," a low score "'may
indicate problems that do not necessarily relate to the ability
to hold a job.'" Ramos v. Barnhart, 513 F. Supp. 2d 249, 261
(E.D. Pa. 2007) (citation omitted).  For that reason, the GAF
score alone does not constitute conclusive evidence of a work-
related mental impairment.  See, e.g., Hillman v. Barnhart, 48
F. App'x 26, 29 n.1 (3d Cir. 2002).  Indeed, the Court of
Appeals for the Third Circuit has affirmed an ALJ's finding of
no disability in the face of a GAF score of 35, far lower than
the GAF score assigned by Dr. Shang in this instance.  See,
e.g., Wallace v. Apfel, 29 F. App'x 842, 845 (3d Cir. 2002).
[18] Plaintiff's briefing conveniently ignores the "significant"
difference between Dr. Shang's GAF score of 50, and Dr.
Lazarus's later-in-time GAF score of 51.  Rivera, 9 F. Supp. 3d
at 504 (explaining the "significant" difference between a GAF
score of 51 and 50)

concerning his daily activities and social interactions.  (See id. at 27-28.)  In other words, the record depicted Plaintiff as a person in a state of improvement, and again, he produced no contrary record evidence.

For all of these reasons, and under the particular facts of this action, the Court discerns no error in the ALJ's evaluation of Plaintiff's GAF score by Dr. Shang.

### b. The ALJ appropriately relied upon the opinions of the agency physicians

Plaintiff argues that the ALJ improperly afforded "great weight" to the opinions of two state agency physicians, Dr. Abrams and Dr. Foley, because their findings purportedly prove "inconsistent with the findings" of the Vineland Board of Education and "the relevant hospital records."  (Pl.'s Br. at 13 (citation omitted).)  The Court, however, finds this argument without merit.

First, Plaintiff's reliance upon records from the Vineland Board of Education, all of which bear dates ranging from February 2008 to September 2008, is misplaced.  (See, e.g., R. at 234-284.)  Critically, although these records indicate that Plaintiff suffered from a low IQ and learning difficulties requiring individual accommodation (see, e.g., R. at 237, 239, 251, 264, 266), all of these records pre-date Plaintiff's alleged onset of disability date, and therefore are of lesser

weight in determining his functional limitations during the period relevant to the ALJ's disability onset.[19]  See, e.g., 20 C.F.R. §§ 416.335, 416.501; Wilson v. Astrue, 2010 WL 1838008, *1 (W.D. Pa. May 5, 2010) (explaining that the relevant period for an SSI claim begins at the time of the application). Nevertheless, the ALJ did indeed consider the education records as evidence of Plaintiff's learning disability.  The ALJ, however, nonetheless credited Plaintiff's more-contemporaneous testimony concerning his abilities to "read and write in both English and Spanish," as well as the results of the independent medical evaluations.  (R. at 27.)

Nor does the record support Plaintiff's contention that the ALJ failed to appropriately evaluate the records from Plaintiff's hospitalization (and instead relied upon the agency physicians).  (See Pl.'s Br. at 13-14.)  Indeed, the ALJ plainly discussed Plaintiff's one-week hospitalization throughout his decision, and specifically recited the bases for his hospitalization (hallucinations, depression, and suicidal ideations), as well as the discharge notes reflecting

---

[19] As summarized above, Plaintiff protectively filed an application for disability benefits on January 17, 2012, alleging disability beginning June 30, 2011, over three (3) years after the majority of the Vineland Board of Education records.  For that reason, there can be no meaningful inconsistency between these records and the opinions of the state agency experts.

Plaintiff's marked improvement with medication. (See, e.g., R. at 26, 291.) The ALJ then emphasized, as explained above, the absence of any additional mental health evidence from Plaintiff, as well as his own failure to appear for a follow-up psychological evaluation. (See id. at 25-28.) As a result, the ALJ necessarily resorted to Plaintiff's own testimony concerning his functional abilities, as well as the consistent findings of the agency physicians and experts (Dr. Brams and Dr. Foley being only two of six opinions cited by and relied upon by the ALJ). (See id. at 25-28.) These experts, in turn, opined in relevant part that Plaintiff could follow short and simple instructions, keep adequate pace, and adapt to routine work-related tasks with minimal contact with others. (See, e.g., R. at 84-85, 96-98.)

In the absence of any relevant contrary evidence (none of which has been cited by Plaintiff), the Court finds no error in the ALJ's reliance upon the opinions of the agency physicians.[20]

**V. CONCLUSION**

For all the reasons set forth herein, the Court finds that substantial evidence supports the ALJ's determination that Plaintiff did not have a qualifying disability under the Social

---

[20] Because the Court finds no error in the ALJ's decision denying disability benefits, the Court necessarily denies Plaintiff's request for a summary finding of disability. (See Pl.'s Br. at 15-16.)

Security Act.  As a result, the ALJ's decision will be affirmed.

An accompanying Order will be entered.


**December 8, 2015**                    **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         Chief U.S. District Judge